**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| **DEEPA SONI, M.D.** ) | |
| ) | **CIVIL ACTION** |
| **Plaintiff,** ) | |
| ) | **NO. 4:16-CV-10630-TSH** |
| **v.** ) | |
| ) | |
| **ROBERT WESPISER, M.D., TIMOTHY** ) | |
| **COUNIHAN, M.D. BERKSHIRE** ) | |
| **MEDICAL CENTER, INC. BERKSHIRE** ) | |
| **FACULTY SERVICES, INC., and** ) | |
| **BERKSHIRE HEALTH SYSTEMS, INC.** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

<u>**MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS**</u>
<u>**(Docket No. 25)**</u>

**March 3, 2017**

**HILLMAN, D.J.**

Plaintiff Deepa Soni, M.D., a board-certified, female neurosurgeon of Indian descent, filed this thirty-five count complaint alleging defendants Robert Wespiser, M.D., Timothy Counihan, M.D., Berkshire Medical Center, Inc., Berkshire Faculty Services, Inc., and Berkshire Health Systems, Inc. discriminated against her on the basis of her gender and ethnicity, retaliated against her, made defamatory statements against her which negatively impacted her career, and negligently and intentionally caused her emotional distress.  Defendants move to dismiss all counts in the complaint pursuant to Fed. R. Civ. P. 12(b)(6) on numerous grounds, including that the claims fail as a matter of law, are time barred, and/or lack sufficient factual support.  Plaintiff voluntarily dismissed Counts 1, 2, 11 and 12, leaving counts 3-10, and 13-35 currently pending.  For the reasons detailed below, defendants' motion to dismiss (Docket No. 5) is ***granted in part and denied in part***.

1

## Background

The facts, as summarized from the complaint, are as follows.  Plaintiff Deepa Soni is a board certified, Harvard-trained neurosurgeon of Indian descent.  She is the second woman to complete Harvard's neurosurgery training program in its 80-year history, and the first Indian woman to do so.  She began working at defendant Berkshire Medical Center, Inc. ("BMC") in November 2008, pursuant to her employment contract with defendant Berkshire Faculty Services, Inc., both of which fall under the control of defendant Berkshire Health Systems, Inc.  Defendant Dr. Timothy Counihan, Chairperson of Surgery at BMC, was her direct supervisor, and she was further supervised by defendant Dr. Robert Wespiser, the Chief of Staff at BMC.

Dr. Soni alleges that Dr. Counihan displayed discriminatory and retaliatory behavior toward her throughout her employment with BMC because she was a female minority who had achieved greater stature than he, she had complained to him about unsafe practices at BMC, and had previously sued other male doctors for gender discrimination.  She complained about his failures as Chief of Surgery to BMC administration, though she does not allege that she ever reported his retaliatory or discriminatory behavior toward her during her employment at BMC.  The complaint alleges that Dr. Wespiser was "passive and deferred to Dr. Counihan's wishes, including participating in discrimination and retaliation against Dr. Soni."  Compl. ¶28.

In September 2009, Dr. Soni gave notice of her resignation to BMC, and worked there until May 2010, in accordance with the terms of her employment agreement.  She alleges that, after tendering her resignation, Dr. Counihan, with the consent of Dr. Wespiser, undertook a "sham" peer review of her work outside of the BMC's defined peer review procedures, which did not conclude until May 2010, just before her final day at BMC.  She asserts that this unorthodox peer

review instilled fear and inhibited her from voicing any further complaints while at BMC.  While Dr. Soni pled generally that Drs. Counihan and Wespiser discriminated and retaliated against her, this "sham" peer review is the only example of such conduct during her employment with the defendants that is specifically alleged in the complaint.

In 2012, Dr. Soni's successor in the neurosurgery department at BMC, Dr. Al-Atassi, reached out to her to discuss disparate treatment that he had experienced, which he believed to be discriminatory and retaliatory, including a similar "sham" peer review.  Dr. Soni assisted him in retaining counsel to pursue an employment discrimination action.

Dr. Soni accepted a position at New Hampshire NeuroSpine in the spring of 2013, and as required by her new post, she sought privileges at three area hospitals in April 2013, including Catholic Medical Center ("CMC").  While she was granted privileges at the other two hospitals, in July 2013, the Director of Medical Staff Support Services at CMC, Christine Senko, advised Dr. Soni that her application for privileges at CMC was denied.  This was the first time in her career that any hospital had refused to grant her privileges.  Dr. Soni was informed that the decision was based on a letter sent by Dr. Counihan to the credentialing committee, and a telephone conversation between Dr. Counihan and Dr. Mahon, its chairperson.  Dr. Soni spoke with Dr. Mahon, who "said, in essence, that Dr. Counihan's remarks were the reason that Catholic Medical Center decided to 'not move forward with credentialing [her].'" Compl. ¶49.  Dr. Soni did not list Dr. Counihan as a reference, and asserts that he would not have been the appropriate person at BMC to have provided credentialing information.

Dr. Counihan admitted to Dr. Soni that he had sent a letter to CMC claiming "she had certain unspecified 'difficulties' while working at [Berkshire Medical Center]." Compl. ¶51.  Dr. Soni asserts that any such statements are false.  Dr. Soni then informed Dr. Wespiser of her

concerns that both he and/or Dr. Counihan had relayed false and defamatory statements about her to CMC.  Dr. Wespiser denied communicating directly with CMC, but also refused to correct the alleged misinformation provided by Dr. Counihan, despite Dr. Soni's request for his assistance, and despite that, as Chief of Staff, such information "should have been provided by him." Compl. ¶53.

An unnamed member of the CMC credentialing committee advised Dr. Soni in August 2013 that he was "'aware of [her] situation,' and that she had been wronged." Compl. ¶56.  Dr. Soni alleges that in a meeting with this unnamed individual, he disclosed to her that "Dr. Counihan made vicious and defamatory statements about her in a letter, and that the letter was followed by a telephone conversation which was even worse." Compl. ¶57.  He did not provide specific details of the statements made by Dr. Counihan, but he confirmed that "Dr. Counihan said, in essence, that Dr. Soni would be trouble for the hospital because she had filed multiple lawsuits against other hospitals," and the committee "made its decision in part based on the fact that she had previously sued other doctors and hospitals for discrimination."  Compl. ¶57 & 59.  This same individual also shared that the credentialing committee had "essentially ignored her reference letters from several Board Certified neurosurgeons, which were 'glowing,' as well as her own credentials, i.e., Board Certification, no malpractice history, fellowship training, etc." Compl. ¶58.

Because she was not granted privileges at CMC, Dr. Soni was unable to keep her position at New Hampshire NeuroSpine.  She alleges that she suffered lost wages and emotional distress as a result.

In November 2013, Dr. Soni began practicing part time at Baystate Medical Center ("Baystate"), and in December 2013, she accepted a patient transferred from a physician at BMC.  Dr. Soni alleges that this alerted Dr. Counihan to her new employment at Baystate.  One month

later, Dr. Soni "learned from her boss that Dr. Counihan was defaming her to senior leadership at Baystate, and that negative comments had made it to the Chair of Surgery at Baystate." Compl. ¶63. Her boss also "indicated to her that her hiring had to be defended and justified to the Department Chair after this episode." *Id.*

Despite this setback, from March to September 2014, multiple physicians at Baystate "expressed repeated and strong interest in bringing Dr. Soni on board for a permanent Neurosurgical position," and she was told by a member of the leadership team on September 2, 2014 that "'the job is yours…we just have to sort out the details with senior administration.'" Compl. ¶64. Later that month, however, Dr. Soni alleges there was a sudden and dramatic shift, including previously friendly and supportive staff avoiding her and acting "cold" toward her. In addition, Baystate hired two new neurosurgeons with fewer qualifications than Dr. Soni, and assigned cases to them instead of her. Dr. Soni asked some of the physicians with which she worked closely whether the loss of assignments was related to problems with her work, and they assured her that was not the case. In December 2014, Dr. Soni asked a senior physician about the decision to give assignments to the less qualified neurosurgeons, and he responded "it's not like anyone is discriminating against you." Compl. ¶68. This struck Dr. Soni as odd as she had made no suggestion that she was a victim of discrimination.

In March 2015, Dr. Soni expressed interest to a senior staff member in the full-time neurosurgeon position Baystate was then advertising, and was told that several candidates were being interviewed. Dr. Soni was not interviewed, and she alleges several physicians indicated their surprise that she was not being considered for the post. Dr. Soni sent a formal letter of interest and her curriculum vitae in response to the advertised full-time neurosurgery position to Baystate on April 1, 2015, but her application materials received no acknowledgement or response. She

was approached by an unnamed member of the leadership team on April 3, 2015, and notified that the published advertisement mistakenly sought a general neurosurgeon when the hospital was actually looking to recruit a functional neurosurgeon (a specific sub-specialty), and had already filled the position.  He told her that he had spoken with hospital administration previously, and that many physicians were interested in bringing Dr. Soni on full time, but that the administration "said that it was not interested in her because of the purported 'problems' that she had at [BMC]."  Compl. ¶74.  The individual hired to fill the full-time position advertised at Baystate was a general neurosurgeon lacking subspecialty training in functional neurology, and was considerably less qualified than Dr. Soni.  Dr. Soni alleges that since 2013 and up to the date of the filing of this action, Dr. Counihan continued to make false and defamatory statements about her to others.

*Claims against individual defendants*

Dr. Soni brings claims against Dr. Wespiser for discrimination based on gender and ethnicity in violation of 42 U.S.C. § 2000, *et seq*. (Count 1); retaliation in violation of 42 U.S.C. § 2000, *et seq*. (Count 2); discrimination based on gender and ethnicity in violation of Mass. Gen. L. ch. 151B (Count 3); retaliation in violation of Mass. Gen. L. ch. 151B (Count 4); interference with right to be free of discrimination in violation of Mass. Gen. L. ch. 151B §§ 4(4A) (Count 5); aiding and abetting unlawful actions in violation of Mass. Gen. L. ch. 151B §§ 4(5) (Count 6); defamation (Count 7); tortious interference with contractual and/or advantageous relationships (Count 8); intentional infliction of emotional distress (Count 9); and negligent infliction of emotional distress (Count 10).

Dr. Soni brings claims identical claims against Dr. Counihan: discrimination based on gender and ethnicity in violation of 42 U.S.C. § 2000, *et seq*. (Count 11); retaliation in violation

of 42 U.S.C. § 2000, *et seq.* (Count 12); discrimination based on gender and ethnicity in violation of Mass. Gen. L. ch. 151B (Count 13); retaliation in violation of Mass. Gen. L. ch. 151B (Count 14); interference with right to be free of discrimination in violation of Mass. Gen. L. ch. 151B §§ 4(4A) (Count 15); aiding and abetting unlawful actions in violation of Mass. Gen. L. ch. 151B §§ 4(5) (Count 16); defamation (Count 17); tortious interference with contractual and/or advantageous relationships (Count 18); intentional infliction of emotional distress (Count 19); and negligent infliction of emotional distress (Count 20).

### *Claims against corporate defendants*

In addition, Dr. Soni brings claims against Berkshire Medical Center, Inc. for discrimination based on gender and ethnicity in violation of 42 U.S.C. § 2000, *et seq.* (Count 21); retaliation in violation of 42 U.S.C. § 2000, *et seq.* (Count 22); discrimination based on gender and ethnicity in violation of Mass. Gen. L. ch. 151B (Count 23); retaliation in violation of Mass. Gen. L. ch. 151B (Count 24); and negligent infliction of emotional distress (Count 25).

Dr. Soni brings claims against Berkshire Faculty Services, Inc. for discrimination based on gender and ethnicity in violation of 42 U.S.C. § 2000, *et seq.* (Count 26); retaliation in violation of 42 U.S.C. § 2000, *et seq.* (Count 27); discrimination based on gender and ethnicity in violation of Mass. Gen. L. ch. 151B (Count 28); retaliation in violation of Mass. Gen. L. ch. 151B (Count 29); and negligent infliction of emotional distress (Count 30).

Finally, Dr. Soni brings claims against Berkshire Health Services, Inc. for discrimination based on gender and ethnicity in violation of 42 U.S.C. § 2000, *et seq.* (Count 31); retaliation in violation of 42 U.S.C. § 2000, *et seq.* (Count 32); discrimination based on gender and ethnicity in

violation of Mass. Gen. L. ch. 151B (Count 33); retaliation in violation of Mass. Gen. L. ch. 151B (Count 34); and negligent infliction of emotional distress (Count 35).

## Discussion

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559, 127 S. Ct. 1955 (2007). Although detailed factual allegations are not necessary to survive a motion to dismiss, the standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 13 (1st Cir. 2011).

In evaluating a motion to dismiss, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Langadinos v. American Airlines, Inc.*, 199 F.3d 68, 68 (1st Cir. 2000). It is a "context-specific task" to determine "whether a complaint states a plausible claim for relief," one that "requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937 (2009) (internal citations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). On the other hand, a court may not disregard properly pled factual allegations, "even if it strikes a savvy judge that actual proof of those facts is improbable." *Twombly*, 550 U.S. at 556.

*Counts 3, 13, 21, 23, 26, 28, 31 and 33 – Discrimination based on gender and ethnicity in*
*violation of Title VII and Mass. Gen. L. ch. 151B*

Defendants argue that all of Dr. Soni's employment discrimination claims, under both Title

VII and Chapter 151B, are time barred because she did not exhaust her administrative remedies by

filing a Charge of Discrimination ("Charge") with the Equal Employment Opportunity

Commission (EEOC) and the Massachusetts Commission Against Discrimination (MCAD) within

300 days of the alleged discriminatory act as required by each statute.  See 42 U.S.C. § 2000e–

5(e); Mass Gen. L. ch. 151B §5.  Dr. Soni filed a Charge with both the EEOC and MCAD on

March 21, 2014, thus the 300-day rule requires the conduct forming the basis of her claims to have

occurred after May 25, 2013.[1]

Defendants are correct that any claim relying solely on the defendants' conduct during

Dr. Soni's employment with Berkshire in 2008-2010 is time barred.  However, the complaint

alleges that Dr. Soni was notified of her denial of privileges at Catholic Medical Center, and the

defendants' hand in that decision, in July 2013.  The complaint further provides that Dr.

Counihan's communications with Baystate Medical Center occurred at some point after

December 2013, so both the EEOC and MCAD Charges were timely filed with regards to those

events.  Therefore, Dr. Soni's employment discrimination claims may not be dismissed as

---

[1] In addition, Mass. Gen. L. ch. 151B § 9 further provides that "[a]ny person claiming to be
aggrieved by a practice made unlawful under this chapter … may, at the expiration of ninety
days after the filing of a complaint with the commission, or sooner if a commissioner assents in
writing, but not later than three years after the alleged unlawful practice occurred, bring a civil
action for damages or injunctive relief or both …."  Dr. Soni filed her complaint on March 31,
2016, therefore her state law claims are timely if the alleged discriminatory conduct occurred
after March 31, 2013.

untimely because at least some of the discriminatory actions alleged in the complaint fall within the allowed time period.

Defendants further argue that, because Dr. Soni left Berkshire three years before the alleged discriminatory acts occurred, the events do not bear the connection to the employment relationship necessary to maintain a claim for employment discrimination under either Title VII or Chapter 151B.  In essence, defendants take the position that neither federal nor state discrimination statutes allow a cause of action for post-employment discrimination.  The court shall address the scope of each statute in turn.

<u>Title VII</u>

Section 703(a) of Title VII makes it unlawful for any "employer" to "fail or refuse to hire or to discharge any individual, ***or otherwise to discriminate against any individual*** with respect to his compensation, terms, conditions, ***or privileges of employment***, because of such individual's race, color, religion, sex, or national origin…." 42 U.S.C. § 2000e-2(a) (1964) (emphasis added).[2]  While the First Circuit has not yet addressed whether the post-employment provision of a reference falls within the "privileges of employment" protected by § 703(a), courts that have considered the issue have recognized that providing an adverse employment reference may be actionable under the substantive anti-discrimination provision of Title VII.  *See Shehadeh v. Chesapeake & Potomac Tel. Co. of Maryland*, 595 F.2d 711, 723 (D.C. Cir. 1978) (holding that a practice of providing negative references to prospective employers with discriminatory motives "plainly would establish a severe constriction of job-market access….

---

[2] The Supreme Court has construed the term "employer," as used in § 704(a), to encompass both current and former employers, and pointed out that "several sections of the statute plainly contemplate that former employees will make use of Title VII's remedial mechanisms," and that "[t]hese include § 703(a)….'" *Robinson v. Shell Oil Co.*, 519 U.S. 337, 338, 117 S. Ct. 843 (1997).

10

erect artificial barriers that Congress endeavored to foreclose and … is outlawed by Section 703(a)."); *Tarvesian v. Carr Div. of TRW, Inc.*, 407 F. Supp. 336, 340 (D. Mass. 1976) (declining to hold "as a matter of law that bad references could not violate Title VII."); *Deneffe v. Skywest, Inc.*, 2015 WL 2265373, at *7 (D. Colo. May 11, 2015) ("Certainly, a negative employment reference could adversely affect an individual's conditions or privileges of employment and/or deprive an individual of employment opportunities.").

This court agrees that the statutory language of § 703(a) may extend to the provision of an employment reference, particularly in circumstances where the provision of references is a customary privilege of employment (albeit one that extends into the post-employment period[3]), and where it is a significant factor in future access to the job market.  Considering the general scope of the legislative intent of Title VII to secure equal access to the workplace, the provision of negative information by Dr. Counihan to CMC and Baystate concerning Dr. Soni can reasonably be inferred from the facts in the complaint to be discriminatory acts that denied her a privilege of employment.

Defendants further argue that Dr. Soni does not meet the necessary elements to prevail on her Title VII discrimination claims because she cannot allege an "adverse employment action." To prevail on a discrimination claim under § 703(a), a plaintiff must prove that 1) she is a member of a protected class, 2) she had the necessary qualifications, 3) she suffered an adverse employment action, and 4) the adverse employment action occurred under circumstances that support a reasonable inference that the employer's action was based on her membership in the

---

[3] Provision of references is not necessarily unique in this regard; it is foreseeable that other privileges of employment, such as continuing availability of certain benefits, or access to electronic files stored on an employer's network, *where such things are customarily extended to ex-employees*, could also form the basis of an action.

protected class.  *See Lockridge v. The Univ. of Maine Sys.*, 597 F.3d 464, 470 (1st Cir. 2010);

*Kosereis v. Rhode Island*, 331 F.3d 207, 212-13 (1st Cir. 2003).

The provision of a negative reference to a prospective employer may constitute an

adverse employment action.  In *Palmquist*, the First Circuit had the opportunity to clarify that a

negative job reference cannot form the basis of an action under Title VII as a matter of law, but

declined to so.  *Palmquist v. Shinseki*, 689 F.3d 66, 70-71 (1st Cir. 2012).  Other Circuits have

consistently recognized that, with respect to Title VII, the employment relationship extends into

the post-employment period with respect to the provision of references.  *See, e.g., Brooks v. City*

*of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000) ("Among those employment decisions that can

constitute an adverse employment action are … dissemination of a negative employment

reference…."); *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997);

*Rutherford v. Am. Bank of Commerce*, 565 F.2d 1162, 1164 (10th Cir. 1977) (former employer

of plaintiff held liable under Title VII for advising plaintiff's prospective employer that she had

previously filed a discrimination charge).  The Second Circuit noted an absence of "bright-line

rules" applicable to recovery under claims where an employer "blacklists" a former employee,

"refuses to write a recommendation to prospective employers," or "sullies a [former employee's]

reputation," and counseled that "courts must pore over each case to determine whether the

challenged employment action reached the level of adverse."  *Wanamaker*, 108 F.3d at 466

(internal citations omitted).[4]

---

[4] *See also Pantchenko v. C.B. Dolge Co.*, 581 F.2d 1052, 1055 (2d. Cir. 1978); *Bascom v. Fried*, 2008 WL 905210, at *4 n.3 (E.D.N.Y. Mar. 31, 2008) ("There is little question that the dissemination of adverse employment references can constitute a violation of Title VII if motivated by discriminatory intent.") (citing *Blanke v. Rochester Tel. Corp.*, 36 F.Supp.2d 589, 600 (W.D.N.Y.1999); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166 (2d Cir.2005) (giving negative references in retaliation for protected activity considered retaliation in violation of Title VII)).

The complaint alleges that Dr. Soni is a member of a protected class, and that she suffered lost career opportunities and reputational harm after the defendants supplied damaging references to her prospective employers.  Discriminatory animus is easily inferred from the content of Dr. Counihan's message – that Dr. Soni is trouble because she files discrimination lawsuits.

Facially, it appears that the provision of these references with respect to Dr. Soni's prior employment at BMC by her supervisors at BMC creates a nexus that plausibly includes the three corporate entities named as defendants in this suit under the construction that they are subject to vicarious liability for the discriminatory actions of their employees, Drs. Counihan and Wespiser, as supervisors of Dr. Soni.  *See Farragher v. City of Boca Raton*, 524 U.S. 775, 775, 118 S. Ct. 2275 (1998) ("An employer is vicariously liable for actionable discrimination caused by a supervisor…").  Consequently, the motion to dismiss Counts 21, 26 and 31, alleging employment discrimination in violation of Title VII against all three corporate defendants, is denied.

<u>Chapter 151B</u>

Turning to the scope of Chapter 151B, defendants cite *Thomas O'Connor Constructors, Inc. v. MCAD*, 72 Mass.App.Ct. 549, 555-56 (2008), for highlighting that "no Massachusetts appellate decision has ever interpreted § 4(1) to apply to an action brought by or against someone outside of the employment unit."  However, Dr. Soni's claims are not limited to violations of § 4(1).  Her Chapter 151B discrimination claims find legs in the language of § 4(4A), which does not limit liability to "employers," but makes it unlawful for "***any person*** to … interfere with another person in the exercise or enjoyment of any right granted or protected by this

chapter….".[5]   In fact, the *O'Connor* court declined to overturn the lower court's decision that the defendant, who was not an employer or an employer-agent of the plaintiff, was still liable for discrimination under § 4(4A).   *Id.*

The First Circuit has also noted that Massachusetts case law and MCAD decisions[6] have held that § 4(4A) does not require the existence of an "employment relationship" to impose liability.   *See Barton v. Clancy*, 632 F.3d 9, 20 (2011).   While the *Barton* court ultimately held that the defendant, who was a neither the plaintiff's employer nor an employer-agent, was not liable, the facts are distinguishable.   The *Barton* court declined to expand the currently existing law to find liability when the alleged harasser was not physically present at the plaintiff's worksite and the harassing conduct did not occur at the plaintiff's worksite.   In the present case, the alleged discriminatory conduct is intimately tied to Dr. Soni's workplace.   Dr. Counihan called and sent a letter to the credentialing committee of the hospital at which Dr. Soni sought privileges to work, and he contacted physicians or administrators at Baystate, where Dr. Soni was seeking a full-time position.   Although he didn't need to be physically present to do so, Dr. Counihan's actions reached into Dr. Soni's work environment in a manner that was both directed at her work situation and materially impacted her employment.   Accordingly, the court denies the motion to dismiss with regards to counts 13, 23, 28 and 33.

Unlike Title VII, Chapter 151B allows for recovery against individual defendants found liable for discrimination under the statute.   *See Martin v. Irwin Indus. Tool Co.*, 862 F. Supp. 2d 37, 39 (D. Mass. 2012); *Beaupre v. Cliff Smith & Assocs.*, 50 Mass. App. Ct. 480, 490-91 (2000);

---

[5] A corporation is a "person" as defined in Mass. Gen. L. ch. 151B § 1(1).
[6] "Administrative decisions of the MCAD are to be accorded deference in the interpretation of ch. 151B."   *Barton*, 632 F.3d at 20 n.8 (citing *College–Town, Div. of Interco, Inc. v. Mass. Comm'n Against Discrimination*, 400 Mass. 156 (1987)).

*Rushford v. Bravo's Pizzeria & Restaurant,* 2001 WL 1602825, at *7–8 (MCAD May 19, 2001) (collecting cases and noting that the Commission "has long recognized and imposed individual liability under [chapter 151B]").  Dr. Wespiser asserts that the complaint fails to plead adequate facts to support any claim of discrimination against him individually.  The Supreme Judicial Court of Massachusetts has construed Chapter 151B as "containing four elements an employee must prove to prevail on a claim of discrimination in employment: membership in a protected class, harm, discriminatory animus, and causation."  *Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 39 (2005).

Membership and harm being undisputedly established in the complaint, dismissal is precluded if the elements of discriminatory animus and causation pass muster.  At this stage, the requirements for adequately pleading the discriminatory motivation element are modest.  Dr. Soni need only plead sufficient facts to make it plausible that Dr. Wespiser acted with discriminatory animus.  *Bell Atl. Corp.*, 550 U.S. at 559; *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 54 (1st Cir. 2013) ("Although a plaintiff must plead enough facts to make entitlement to relief plausible in light of the evidentiary standard that will pertain at trial—in a discrimination case, the prima facie standard—she need not plead facts sufficient to establish a prima facie case").  "'Smoking gun' proof of discrimination is rarely available, especially at the pleading stage."  *Grajales v. Puerto Rico Ports Auth.*, 682 F.3d 40, 49 (1st Cir. 2012).

Dr. Soni alleges that, as Chief of Staff, it was part of Dr. Wespiser's responsibilities to provide professional references.  She asked him to intervene and correct the damaging misinformation provided by Dr. Counihan, yet he did nothing.  Lack of action under circumstances where a reasonable person would expect action is tantamount to an action,

especially in a circumstance like the one at hand, where there is a strong presumption that professional references are delivered with candor and integrity.

In addition, Dr. Soni pleads that she was subject to sham peer review at the hands of Drs. Wespiser and Counihan when employed at BMC, and that her successor, Dr. Al-Attasi, also a minority, shared with her that he believed he was being discriminated against and retaliated against, including a similar sham peer review, to such an extent that he retained counsel with Dr. Soni's assistance.  Those facts lend credence to a potential discriminatory motive here.

Dr. Soni's allegations regarding a pattern of behavior at BMC in which Dr. Wespiser was involved, and the claim that he held a position of responsibility creating an expectation within professional norms that he would provide complete and accurate references to other institutions but yet failed to do so, are sufficient to make it plausible that Dr. Wespiser acted with discriminatory intent.  Given the difficulty of establishing the truth without proceeding, and the structural difficulty in unravelling the difficult question of motivation (discriminatory or otherwise) based on the pleadings, the court declines to dismiss Count 3 at this stage.


*Counts 4, 14, 22, 24, 27, 29, 32 and 34 – Retaliation in violation of Title VII and Mass. Gen. L. ch. 151B*

Dr. Soni asserts claims for retaliation in violation of Mass Gen. L. ch. 151B against all defendants, and violations of Title VII against the corporate defendants.  Defendants argue that Dr. Soni fails to state a claim for retaliation under Title VII or Chapter 151B because she has not alleged the protected activity or necessary causal connection to support her retaliation claims. "To engage the gears of either statute, a plaintiff must show that (i) she undertook protected conduct, (ii) she suffered an adverse employment action, and (iii) the two were causally linked." *Noviello*

*v. Boston*, 398 F.3d 76, 88 (1st Cir. 2005) (citing *Dressler v. Daniel,* 315 F.3d 75, 78 (1st Cir. 2003) (Title VII); *Sullivan v. Raytheon Co.,* 262 F.3d 41, 48 (1st Cir. 2001) (chapter 151B)). "Incorporated into the third element is the requirement that the plaintiff show that the defendant had knowledge of the protected conduct." *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 500–01 (D. Mass. 2008) (citing *Hazel v. U.S. Postmaster General,* 7 F.3d 1, 3 (1st Cir.1993); *Brissette v. Franklin County Sheriff's Office*, 235 F.Supp.2d 63, 93 (D. Mass. 2003)).

Defendants' argument regarding a failure to plead a protected activity is easily disposed of. Dr. Soni's complaint alleges that she filed a prior lawsuit alleging discrimination, which is unquestionably protected activity. 42 U.S.C. § 2000e-3(a); Mass. Gen. L. ch. 151B § 4(4), 4(4A). *See also Rodriguez-Vives v. Puerto Rico Firefighters Corps of Puerto Rico*, 743 F.3d 278, 283-84 (1st Cir. 2014).

Defendants next assert that causation may only be inferred when the adverse actions occur close in time to the protected conduct, citing *Clark City. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508 (2001), and highlight that defendants' alleged retaliatory behavior occurred years after Dr. Soni engaged in any protected activity.

Defendants read too much into *Breeden*, which lacked the sort of direct evidence of causation alleged here. The *Breeden* court pointed out that "cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Breeden*, 532 U.S. at 273. The court went on to note that an action taken nearly two years after the protected activity, "suggests, *by itself*, no causality at all." *Id.* (emphasis added). In *Breeden*, the respondent sought to infer causation from the temporal proximity of the protected activity to the adverse action because she lacked the kind of

17

direct evidence causally linking the adverse action and protected activity Dr. Soni alleges in her complaint: Dr. Counihan communicated with prospective employers and told them specifically that Dr. Soni had filed previous discrimination lawsuits and would be trouble, and that at least one of those prospective employers indicated that his remarks were the basis for its decision.

As Dr. Soni points out, the causal connection is clear, because the adverse actions at CMC and Baystate "followed close on the heels of Dr. Counihan's statements not once, but twice." Dr. Counihan is alleged to have dredged up the specter of protected activity from the past and used it to trigger very real and immediate harmful consequences. The sheer reach of the reprisal that is alleged to have occurred here is such that, if it were to allowed to escape the scope of the statute, it would provide a road map to delayed revenge, and give those who might wish to avail themselves of the enumerated protections some serious pause for thought concerning the long-term efficacy of the anti-retaliation provisions.

Defendants also assert that it is the action of the "decisionmaker" that determines retaliation, citing *Velazquez-Ortiz v. Vilsack*, 657 F.3d 64 (1st Cir. 2011), and the Court agrees. However, simply pointing to decisions by CMC and Baystate not to hire Dr. Soni, and implying that it was these decisions that harmed Dr. Soni, does not erase any responsibility that decisionmakers at BMS incurred as a result of their choice to provide negative references in the first place. *Velazquez-Ortiz*, a Title VII case in which the alleged adverse action occurred while plaintiff was the employee of defendant, is inapplicable in the instant action, which concerns post-employment actions by a ***former*** employer. In *Robinson v. Shell Oil Co.*, 519 U.S. 337, 117 S. Ct. 843 (1997), the petitioner filed a lawsuit against a former employer for providing a negative reference in retaliation for his having filed a charge with the EEOC for employment discrimination. The Supreme Court construed the term "employees" in § 704(a) of Title VII to include former

18

employees, and held that a "petitioner may sue respondent for its allegedly retaliatory postemployment actions." *Robinson*, 519 U.S. at 117.

Finally, the complaint clearly alleges defendants had knowledge of her prior discrimination lawsuits, and that those were spun into alleged defamatory statements about Dr. Soni being "trouble." It can be reasonably inferred that the purported communications (or lack of communications, as to Dr. Wespiser) and their timing cost Dr. Soni the position at New Hampshire NeuroSpine because she was unable to obtain credentials at CMC. It is likewise reasonably inferred that similar communications cost her the full-time position at Baystate when she was amply qualified and had already been told the job was hers.

As discussed above, the corporate defendants may be held vicariously liable for the actions of their employees, Drs. Counihan and Wespiser, as supervisors of Dr. Soni. Accordingly, Dr. Soni has stated colorable claims for retaliation, and defendants' motion to dismiss counts 4, 14, 22, 24, 27, 29, 32 and 34 is denied.


*Counts 5 and 15 – Interference with right to be free of discrimination in violation of Mass. Gen. L. ch. 151B, § 4(4A)*

The sole argument advanced by the defendants as to why Dr. Soni's Chapter 151B interference claims against Drs. Counihan and Wespiser should be dismissed is that the discriminatory conduct needed to form the basis of such claims is lacking. As discussed above, this court finds Dr. Soni pled sufficient facts to support her claims for discrimination, thus this court denies the motion to dismiss with respect to counts 5 and 15.

*Counts 6 and 16 – Aiding and abetting unlawful acts in violation of Mass. Gen. L. ch. 151B, § 4(5)*

Defendants submit that Dr. Soni fails to plead any facts that would support a claim of aiding and abetting an act of discrimination.  To prevail on her claims for aiding and abetting unlawful acts in violation of Chapter 151B § 4(5), Dr. Soni must show: (1) that the defendants committed 'a wholly individual and distinct wrong ... separate and distinct from the claim in main'; (2) 'that the aider or abetter shared an intent to discriminate not unlike that of the alleged principal offender'; and (3) that 'the aider or abetter knew of his or her supporting role in an enterprise designed to deprive [her] of a right guaranteed … under G.L. c. 151B.'" *Lopez v. Commonwealth*, 463 Mass. 696, 713 (2012).

The complaint fails to plead facts that show two distinct acts by different parties in a common scheme to amount to aiding and abetting.  Merely consenting to or failing to object to discriminatory conduct is not a separate and distinct wrong.  Dr. Soni's argument that defendants' discriminatory conduct coerced and compelled the corporate defendants to discriminate because they were bound by their employees' actions is likewise invalid.  No facts are pled to suggest misdeeds by the corporate defendants that were separate and distinct from those allegedly committed by Drs. Counihan and Wespiser.  Accordingly, counts 6 and 16 are dismissed.

*Counts 7 and 17 – Defamation*

To prevail on claim of defamation, a plaintiff must show (a) "[t]he defendant made a statement, concerning the plaintiff, to a third party"; (b) "[t]he statement could damage the plaintiff's reputation in the community"; (c) "[t]he defendant was at fault in making the statement"; (d) "[t]he statement either caused the plaintiff economic loss … or is actionable

without proof of economic loss." *Ravnikar v. Bogojavlensky*, 438 Mass. 627, 629 (2003) (internal citations omitted).

Defendants concede that Dr. Soni pleads the requisite elements to state a claim for defamation against Dr. Counihan, but contend that the claims depend on assumptions not grounded in facts.  They complain that the allegations rely on statements made by and to individuals whose names are not provided in the complaint, and that defendants have not been given fair notice of what Dr. Soni's actual claim is, or the factual basis for it, because of the lack of details regarding the text of the alleged defamatory statements.  This court disagrees.

The plaintiff is "not required to set forth the alleged defamatory statements verbatim." *N. Shore Pharmacy Servs., Inc. v. Breslin Associates Consulting LLC*, 491 F. Supp. 2d 111, 124 (D. Mass. 2007).  The defendants admit that at least one of them made statements to CMC concerning Dr. Soni, and it is thus disingenuous to argue that they cannot make out the basis for her defamation claim simply because she has yet to depose those who sent and received the information that the defendants already admit existed.

Defendants also argue that, comments referring to Dr. Soni as "trouble" are purely opinion, and statements made referencing Dr. Soni's prior lawsuits are true.  It is well known that truth is a defense in an action for defamation, but "[o]nly pure opinion based on disclosed nondefamatory facts is protected under the First Amendment."  *Reilly v. Associated Press*, 59 Mass. App. Ct. 764, 770 (2003).  The court must "distinguish between 'pure opinion' and an expression of opinion that implies a false assertion of fact."  *Id.* (citing *Dulgarian v. Stone*, 420 Mass. 843, 847 (1995)).  Further, "defamation can occur by innuendo as well as by explicit

assertion…."  *Brown v. Hearst Corp.*, 54 F.3d 21, 25 (1st Cir. 1995) (citing *Mabardi v. Boston Herald–Traveler Corp.*, 347 Mass. 411 (1964)).

The words "trouble" and "filed prior lawsuits" cannot be read in a vacuum.  When taken together, as they were dished out, the implication is that Dr. Soni is litigious and files frivolous lawsuits.  However, Dr. Soni's prior lawsuits arose out of a single set of facts, and were brought individually against the separate defendants, rather than joining them into a single action, and at the January 25, 2017 hearing, Plaintiff's counsel indicated that those suits were resolved in her favor.  *See Soni v. Boston Med. Ctr. Corp.*, 683 F. Supp. 2d 74, 80 (D. Mass. 2009).  The motion to dismiss count 17 is denied.

While the complaint alleges sufficient facts to support a defamation claim against Dr. Counihan, noticeably missing are any facts that indicate Dr. Wespiser made statements about Dr. Soni to anyone, defamatory or otherwise.  The only inference that can be drawn from the facts provided about Dr. Wespiser is that he did nothing when he should have done something.  Accordingly, the motion to dismiss is granted with respect to Count 7.

*Counts 8 and 18 – Tortious interference with contractual and/or advantageous relationships*

Defendants argue that Dr. Soni did not plead sufficient facts to support a claim of tortious interference with a contractual or advantageous business relationship to state a claim for relief against Drs. Counihan and Wespiser.  To succeed on such a claim under Massachusetts law, a plaintiff must show "(1) the existence of a contract or a business relationship which contemplated economic benefit; (2) the defendants' knowledge of the contract or business relationship; (3) the defendants' intentional interference with the contract or business relationship for an improper

purpose or by improper means; and (4) damages." *Swanset Dev. Corp. v. Taunton*, 423 Mass. 390, 397 (Mass. 1996).

Dr. Soni clearly had relationships with CMC and Baystate which contemplated economic benefit.  As discussed above, it can be reasonably inferred that Dr. Wespiser harbored ill will toward Dr. Soni based on his role in the alleged "sham" peer review of Dr. Soni's work, the similar treatment of Dr. Al-Atassi, and his failure to step in and set the CMC credentialing committee straight after being notified that Dr. Counihan had been providing misinformation.  Based on Dr. Soni's allegations, a reasonable person would expect a professional in Dr. Wespiser's position to step up and make sure that complete and truthful information was provided.  It can likewise be inferred that Dr. Wespiser understood Dr. Soni's prospects for obtaining privileges at CMC hinged, at least in part, on the reference provided by BMS.  Presumably, based on his professional experience, he understood the potential impact of a negative reference.

Dr. Wespiser knew of the business relationship between Dr. Soni and CMC because Dr. Soni notified him when she asked him to step in and correct the misinformation provided by Dr. Counihan.  Whether he was motivated by an improper purpose is much harder to answer at this stage.  Nevertheless, that he was already somehow involved or complicit in the activity can be inferred from his refusal to act when faced with Dr. Soni's allegation concerning Dr. Counihan. Count 8 consequently survives dismissal at this stage.

The facts supporting the claim that Dr. Counihan intentionally interfered with Dr. Soni's advantageous business relationships are considerably more robust.  Dr. Counihan plainly knew of her relationship with CMC; he sent a negative letter to their credentialing committee regarding Dr. Soni, and admitted as much.  The improper purpose is reasonably inferred from the past relationship between the parties – Dr. Soni's vocal disapproval of Dr. Counihan while she was at

BMC, the alleged "sham" peer review he undertook of her work, similar treatment of her minority successor, Dr. Al-Atassi, and the implication of the message Dr. Counihan provided to CMC: Dr. Soni is a litigious troublemaker.  The motion to dismiss Count 18 is denied.

*Counts 9 and 19 – Intentional infliction of emotional distress*

Defendants seek to dismiss both counts of intentional infliction of emotional distress because Dr. Soni fails to allege the "extreme and outrageous" conduct or "severe emotional distress" required to sustain such claims.  To prevail, Dr. Soni must show "(1) that [defendants] intended, knew, or should have known that [their] conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe."  *Polay v. McMahon*, 468 Mass. 379, 385 (2014).  "The standard for making a claim of intentional infliction of emotional distress is very high." *Doyle v. Hasbro, Inc.,* 103 F.3d 186, 195 (1st Cir.1996) (citing *Agis v. Howard Johnson Co.,* 371 Mass. 140, 144-45 (1976)).  "[L]iability cannot be predicated upon 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities,' nor even is it enough 'that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort'; rather, '[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Foley v. Polaroid Corp.*, 400 Mass. 82, 99 (1987) (quoting Restatement (Second) of Torts § 46 (1965)).  "A judge may grant a motion to dismiss where the

conduct alleged in the complaint does not rise to this level." *Polay*, 468 Mass. at 386 (citing *Beecy v. Pucciarelli,* 397 Mass. 589, 596 (1982)).

Taking all facts pled as true, the worst that can be inferred from the complaint is that Dr. Counihan tracked down Dr. Soni's potential employers and told vicious lies about her because she's a woman and a minority, which cost her two jobs, and Dr. Wespiser was in on it.  Even putting "as harsh a face on the [defendants' actions] as the basic facts would reasonably allow," this court cannot reasonably infer that either Dr. Counihan's or Dr. Wespiser's conduct rises to the exceptionally high standard required to qualify as "extreme and outrageous." *Richey v. American Auto. Ass'n,* 380 Mass. 835, 839 (1980).

Further, Dr. Soni must prove that the emotional distress she suffered was "so severe 'that no reasonable [person] could be expected to endure it.'" *Torosian vs. Garabedian*, 2016 WL 4083344, at *4 (D. Mass. Aug. 1, 2016) (quoting Restatement (Second) of Torts § 145, comment j (1965)).  Dr. Soni merely pleads that she suffered "severe emotional distress," without any facts in support of that contention.  Even if Dr. Soni possessed additional facts that showcased the severity of her emotional distress, granting leave to cure this defect would be futile, because the defendants' conduct described does not meet the high standard required to state her claim.  Accordingly, as to Counts 9 and 19, the motion to dismiss is granted.

*Count 10, 20, 25, 30 and 35 – Negligent infliction of emotional distress*

Dr. Soni brings claims for negligent infliction of emotional distress against both Drs. Counihan and Wespiser, as well as the three corporate defendants, under a theory of vicarious liability.  Defendants seek to dismiss the claims on the grounds that Dr. Soni's complaint again fails to plead the necessary elements to state her claim.  "To prevail on a claim of negligent

inflication of emotional distress, a plaintiff must establish: (1) negligence; (2) emotional distress; (3) causation; (4) physical harm; and (5) that a reasonable person would have suffered emotional distress under the circumstances." *Alicea v. Com.*, 466 Mass. 228, 234 n.9 (2013) (citing *Rodriguez v. Cambridge Hous. Auth.,* 443 Mass. 697, 701 (2005)).  Dr. Soni has failed to even allege the bare elements of her claims for negligent infliction of emotional distress, never mind factual support for those claims.  There is nothing in her complaint setting forth the defendants' duty, their breach of that duty, any physical harm, or causation.  Accordingly, Counts 10, 20, 25, 30, and 35 are dismissed.

## Conclusion

For the reasons set forth above, Defendant's motion to dismiss (Docket No. 25) is ***granted in part and denied in part***.  Counts 6, 7, 9, 10, 16, 19, 20, 25, 30 and 35 are dismissed.  Counts 1, 2, 11 and 12 were voluntarily dismissed by the defendants.  As to all remaining counts, the motion to dismiss is denied.

**SO ORDERED.**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**