UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DEEPA SONI, M.D., | ) | |
|         Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 16-10630-TSH |
| ROBERT P. WESPISER, M.D., et al. | ) | |
|         Defendants. | ) | |

### ORDER

**December 20, 2017**

Hennessy, M.J.

      By Order of Reference dated November 20, 2017, pursuant to 28 U.S.C. § 636(b)(1)(A) (Docket #69), this matter was referred to me for a ruling on Plaintiff Deepa Soni's Motion to Compel third party Catholic Medical Center ("CMC") to disclose and deliver to Dr. Soni the documents described in a Subpoena Duces Tecum served on CMC on September 15, 2017. (Docket #52). An opposition to that motion has been filed (Docket #59) as well as a reply (Docket #64) and a sur-reply (Docket #67), and the matter is now ripe for adjudication. By the same order of reference (Docket #69), this matter was also referred to me for a ruling on the parties' Joint Motion to Amend the Discovery Schedule. (Docket #54). For the reasons that follow, the Motion to Compel is ALLOWED and the Joint Motion to Amend is ALLOWED.

I.     BACKGROUND

      Dr. Soni is a Harvard-trained neurosurgeon of Indian descent. (Docket #1 at ¶ 9). Dr. Soni began working at Defendant Berkshire Medical Center, Inc. ("BMC") under contract with Defendant Berkshire Faculty Services, Inc. ("BFS") in November 2008. (Id. at ¶ 16). Dr. Soni's

direct supervisor was Defendant Timothy Counihan, BMC's Chairperson of Surgery and acting Division Chief. (Id. at ¶ 23). Dr. Soni was also supervised by Defendant Robert Wespiser, BMC's Chief of Staff. (Id. at ¶ 26). Dr. Soni left BMC on May 9, 2010. (Id. at ¶ 39).

Dr. Soni alleges that Dr. Counihan displayed discriminatory and retaliatory behavior towards her throughout her employment due to the fact that she was a minority woman who had achieved greater stature than he, because she raised concerns to him about unsafe practices in the Neurosurgery Department, and because she had sued other male doctors for gender discrimination. (Id. at ¶ 24). Dr. Soni openly and repeatedly told the BMC administration that Dr. Counihan lacked leadership, was not supportive of her or the other surgeons, and was not providing clinical support to her as the Chief of Surgery. (Id. at ¶ 25). Dr. Soni alleges that Dr. Wespiser was passive and deferred to Dr. Counihan's wishes, including participating in discrimination and retaliation against Dr. Soni. (Id. at ¶ 28).

In the spring of 2013, Dr. Soni accepted a position at New Hampshire NeuroSpine Institute. (Id. at ¶ 44). Because she was to provide care for patients at Elliot Medical Center, Concord Hospital, and CMC, she sought privileges at those three hospitals. (Id.). Dr. Soni was granted privileges at both Elliot Medical Center and Concord Hospital. (Id. at ¶ 45). However, in July 2013, Dr. Soni was contacted by the Director of Medical Staff Support Services at CMC and advised that CMC would not be granting Dr. Soni privileges.[1] (Id. at ¶ 46).

Applicants for privileges at CMC must first provide references from other qualified practitioners attesting to their education, training, clinical abilities, and competence. (Docket #59-4 at ¶ 5). These references are provided to CMC on a confidential basis in order to promote candor, and are verified through direct personal communication with the referring professional. (Id.). In addition to contacting references, CMC will also solicit additional information about a

---

[1] On July 29, 2013, Dr. Soni withdrew her credentialing application at CMC. (Docket #59-1).

given applicant from other professionals with whom the applicant has trained and worked. (Id. at ¶ 6). Individuals and institutions who provide input to the credentialing committees are given assurances that the information they provide will be kept in confidence. (Id.). All of the actions and recommendations taken by the CMC credentialing committees, and all of the information gathered and generated in the course of the credentialing process are treated as confidential by CMC. (Id. at ¶ 9).

After significant inquiry, Dr. Soni came to understand that she had been denied privileges at CMC based on information contained in a letter sent to the Credentialing Committee at CMC by Dr. Counihan, and a subsequent conversation that Dr. Counihan had with Dr. Patrick Mahon, the Chairperson of the Credentialing Committee. (Docket #1 at ¶ 47). Dr. Soni had not given Dr. Counihan's name as a reference for credentialing. (Id. at ¶ 48).

During a phone call in late July 2013, Dr. Mahon explained to Dr. Soni that Dr. Counihan's remarks were the reason that CMC had decided not to move forward with her credentialing. (Id. at ¶ 49). Dr. Counihan admitted to Dr. Soni that he had provided a letter to CMC in which he claimed that she had certain unspecified difficulties while working at BMC. (Id. at ¶ 51). In August 2013, a member of the CMC Credentialing Committee informed Dr. Soni that Dr. Counihan had made vicious and defamatory statements about her in a letter, and that the letter was followed by a telephone conversation that was even more critical. (Id. at ¶ 57). While the Committee member did not give Dr. Soni the details of all of the statements, he did relate that Dr. Counihan had said, in essence, that Dr. Soni would be trouble for the hospital because she had filed multiple lawsuits against other hospitals. (Id.).

As a result of her failure to obtain privileges at CMC, Dr. Soni was unable to work at a position for which she had otherwise been hired. (Id. at ¶ 60). Dr. Soni filed suit against the defendants on March 31, 2016.

On September 15, 2017, Dr. Soni served a Subpoena Duces Tecum on CMC. (Docket #52-1). In response to the subpoena, CMC supplied a copy of Dr. Soni's communications with CMC and a copy of the application she submitted to CMC for credentialing purposes in 2013. (Docket #59-2). CMC, citing New Hampshire's Quality Assurance Privilege, codified at RSA 151:13-a, declined to produce documents about CMC's credentialing process, including any minutes of internal deliberations or candid assessments of Dr. Soni's fitness received from external sources.[2] (Id.). Dr. Soni filed the instant motion, seeking production of the disputed documents, on November 8, 2017. (Docket #52).

II. STANDARD

Unless otherwise limited by court order, the scope of discovery is as follows:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). "Information within this scope need not be admissible in evidence to be discoverable." Id. Relevant evidence is defined in Federal Rule of Evidence 401 as evidence

---

[2] The New Hampshire Quality Assurance Privilege provides, in relevant part:

> Records of a hospital committee organized to evaluate matters relating to the care and treatment of patients or to reduce morbidity and mortality and testimony by hospital trustees, medical staff, employees, or other committee attendees relating to the activities of the quality assurance committee shall be confidential and privileged and shall be protected from direct or indirect means of discovery, subpoena, or admission into evidence in any judicial or administrative proceeding.

RSA 151:13-a, II.

4

having "any tendency" to make a fact that is of consequence in determining the action more or less probable than it would be without the evidence.

III. ANALYSIS

CMC argues that the peer review information sought by Dr. Soni is privileged. (Docket #59). Assertions of privilege in federal question cases in federal court, such as the instant case, are governed by federal law. See Fed. R. Evid. 501. This is so even where the court is also hearing state law claims pursuant to supplemental jurisdiction. See Krolikowski v. Univ. of Mass., 150 F. Supp. 2d 246, 248 (D. Mass. 2001). Federal Rule of Evidence 501 explains that unless otherwise governed by the Constitution, a federal statute, or rules prescribed by the Supreme Court, "[t]he common law – as interpreted by the United States courts in the light of reason and experience – governs a claim of privilege[.]" There is no Constitutional provision, federal statute, or rule prescribed by the Supreme Court directly on point with the privilege asserted. See Brown v. St. Mary's Hosp., No. 3:14CV228 (DJS), 2015 U.S. Dist. LEXIS 179597, at *5 (D. Conn. Aug. 26, 2015). Additionally, neither the Supreme Court nor the First Circuit has ruled on the existence of a federal medical peer review privilege in the context of an employment discrimination action. See Gargiulo v. Baystate Health, Inc., 826 F. Supp. 2d 323, 326 (D. Mass. 2011).

"The Federal Rules of Evidence empower the federal courts to 'continue the evolutionary development of evidentiary privileges.'" Adkins v. Christie, 488 F.3d 1324, 1328 (11th Cir. 2007) (quoting Trammel v. United States, 445 U.S. 40, 47 (1980)). "However, these privileges remain disfavored and should not be lightly created." Id. (citing United States v. Nixon, 418 U.S. 683, 710 (1974)). Because "[p]rivileges contravene the fundamental principle that the public has a right to every man's evidence," courts "do not create and apply an evidentiary

privilege unless it promotes sufficiently important interests to outweigh the need for probative evidence." Univ. of Pa. v. EEOC, 493 U.S. 182, 189 (1990) (internal alterations and quotations omitted).

The First Circuit has articulated a two prong test for determining whether to recognize a state privilege under federal common law. In re Hampers, 651 F.2d 19, 22 (1st Cir. 1981). First the court must determine whether the state court would recognize such a privilege. Id. If so, the court must then determine "whether the state's asserted privilege is 'intrinsically meritorious in [the court's] independent judgment.'" Id. (quoting Am. Civil Liberties Union of Miss. v. Finch, 638 F.2d 1336, 1343 (5th Cir. 1981)). Because the court finds that the state's asserted privilege is not "intrinsically meritorious" in its independent judgment, the court need not address whether the state court would recognize the privilege.

The First Circuit has directed the courts to evaluate four factors to determine whether a privilege is "intrinsically meritorious:"

> (1) whether the communications originate in a confidence that they will not be disclosed, (2) whether this element of confidentiality is essential to the full and satisfactory maintenance of the relations between the parties, (3) whether this relationship is one which ought to be sedulously fostered, and (4) whether the injury that would inure to the relation by the disclosure of the communications would be greater than the benefit thereby gained for the correct disposal of litigation.

In re Admin. Subpoena Blue Cross Blue Shield of Mass., Inc., 400 F. Supp. 2d 386, 391 (D. Mass. 2005) (citing Hampers, 651 F.2d at 23-24). "These factors need not be applied in order and, if the court answers in favor of the party seeking disclosure on any one of these factors, the privilege is not recognized." Gargiulo, 826 F. Supp. 2d at 327. As have other courts in this district, this court finds that the fourth factor, "which essentially weighs the federal interest against the state interest," is determinative in resolving the instant matter. See id.

6

As the First Circuit has stressed, in determining whether to recognize a state privilege, "[i]t makes a difference whether the federal interest in seeking full disclosure is a weak or strong one." Hampers, 651 F.2d at 22. In the instant case, Dr. Soni asserts that she was denied privileges at CMC, ultimately leading to a loss of employment, due to discriminatory acts that affected the credentialing process. As recognized by the Supreme Court in the context of a tenure decision in a university setting, "the costs associated with racial and sexual discrimination . . . are very substantial. Few would deny that ferreting out this kind of invidious discrimination is a great, if not compelling governmental interest." Univ. of Pa., 493 U.S. at 193. The court finds no reason why this interest would be any less compelling in the hospital setting, and the other courts in this Circuit who have addressed the issue agree. See Gargiulo, 826 F. Supp. 2d at 328; Krolikowski, 150 F. Supp. 2d at 249. The court must next weigh this "great, if not compelling," federal interest in ferreting out racial and sexual discrimination against the objectives underlying the medical peer review privilege at issue, namely "to allow hospitals to carry out their reviews of medical procedures and clinical performance with knowledge that certain documents generated during those reviews cannot be used by malpractice plaintiffs." See Smith v. Alice Peck Day Mem'l Hosp., 148 F.R.D. 51, 56 (D.N.H. 1993).

In Smith v. Alice Peck Day Memorial Hospital, the District of New Hampshire addressed whether the New Hampshire Quality Assurance Privilege, on which CMC relies here, protected documents created in connection with a quality assurance committee where the plaintiff alleged that her staff privileges were revoked in violation of federal employment and civil rights laws. Smith, 148 F.R.D. at 52-53, 56. The court determined that in a situation where the contested documents may contain the only means by which the plaintiff could prove such violations, "the overriding public interest in the enforcement of those laws outweighs any claim that the hospital

would be injured by the disclosure of the allegedly privileged documents." Id. at 56; see Univ. of Pa., 493 U.S. at 193 ("Often . . . disclosure of peer review materials will be necessary in order for the [factfinder] to determine whether illegal discrimination has taken place."). The other courts in this Circuit addressing the issue have also refused to recognize a medical peer review privilege in the context of federal discrimination claims, highlighting the fact that the "disclosure of documents and information bearing primarily on employment issues does not materially conflict with the fundamental objectives of promoting quality health care served by the peer review principle." Krolikowski, 150 F. Supp. 2d at 249 (quoting Holland v. Muscatine Gen. Hosp., 971 F. Supp. 385, 389 (S.D. Iowa 1997)); see Gargiulo, 826 F. Supp. 2d at 328; Marshall v. Spectrum Med. Group, 198 F.R.D. 1, 5 (D. Me. 2000); see also Francis v. United States, No. 09 Civ. 4004 (GBD)(KNF), 2011 U.S. Dist. Lexis 59762, at *13 (S.D.N.Y. May 31, 2011) (noting a "consensus among lower courts and in other circuits that no federal privilege protects medical peer review materials in civil rights or antitrust cases" and listing cases). This court finds the reasoning in these opinions sound and will not take a different approach.

The case which CMC cites in support of applying the privilege here, Tep v. Southcoast Hospitals Group, Inc., does not alter the court's finding. In Tep, the plaintiff alleged that the defendant hospital had violated the Emergency Medical Treatment and Active Labor Act ("EMTALA"), which restricts when hospitals may transfer individuals presenting with emergency medical conditions. Tep v. Southcoast Hosps. Group, Inc., No. 13-11887-LTS, 2014 U.S. Dist. LEXIS 168052, at *1-2 (D. Mass. Dec. 4, 2014). The court found that, in the context of the case before it, the state interest in the asserted privilege outweighed the federal interest generally favoring disclosure. Id. at *13-16. The court emphasized that EMTALA involved subject matter closely intertwined with patient care decisions and that recognition of a privilege

in a case involving violations of EMTALA "would promote important federal interests in ensuring patient safety and preventing 'patient dumping' by encouraging full and fair peer review of adverse events that arise as a result of EMTALA violations . . . without fear that such dialogue will be used in subsequent civil litigation." Id. at *14. In so deciding, the Tep court specifically distinguished the case before it from cases, such as the instant one, alleging discriminatory action, noting "[w]here the federal claim alleges something unrelated to malpractice, such as employment discrimination, courts have determined the privilege would undermine other important federal interests, such as rooting out invidious discrimination." Id. at *13-14.

Nor is this court swayed by CMC's argument that Dr. Soni has failed to make the requisite showing that the material she seeks is unavailable from other sources. CMC argues that Dr. Counihan's general denial of liability contained in his answer to Dr. Soni's complaint is insufficient to show unavailability, instead arguing that Dr. Soni must first depose Dr. Counihan about the matter, and further that Dr. Counihan must testify that he did not make any communications to CMC about Dr. Soni's fitness to practice medicine, before Dr. Soni may seek the materials at issue. (Docket #67 at 2). CMC finds it notable that, several months before Dr. Soni issued her subpoena to CMC, Dr. Counihan issued a subpoena for Dr. Soni's credentialing materials.[3] (Id.). CMC states that, implicit in this request, is an acknowledgement by Dr. Counihan that he made communications to CMC about Dr. Soni. (Id.). The court believes that CMC pushes its suppositions too far.

In his answer to Dr. Soni's complaint, Dr. Counihan specifically denied the "assertion that he made any vicious and defamatory statements about [Dr. Soni]." (Docket #41 at ¶ 57). Dr. Counihan also denied Dr. Soni's allegation that he had admitted to her that he provided a

---

[3] Dr. Counihan withdrew the subpoena in the face of CMC's assertion of privilege. (Docket #67 at 2).

letter to CMC in which he claimed that Dr. Soni had certain unspecified "difficulties" while working at BMC. (See Docket #1 at ¶ 51; Docket # 41 at ¶ 51). CMC argues that, even in light of these denials, Dr. Soni offers only speculation about what Dr. Counihan will say under oath. (Docket #67 at 2). However, the court finds that, in light of Dr. Counihan's specific denial of Dr. Soni's allegations, it would not be in any way speculative to posit that Dr. Counihan would testify consistently with the denials in his answer. (See Docket #41 at ¶ 57). While it is possible that Dr. Counihan may testify at a deposition that he communicated with CMC about Dr. Soni's fitness to practice medicine, Dr. Soni would still be unable to explore whether Dr. Counihan's testimony was both accurate and complete without access to the materials sought. While CMC has put its gloss on Dr. Counihan's reasons for subpoenaing Dr. Soni's credentialing materials, this court finds it just as likely that Dr. Counihan's subpoena indicates that he does not fully remember what he communicated to CMC.

IV.  CONCLUSION

For the foregoing reasons, I ORDER that the Motion to Compel (Docket #52) be ALLOWED and the Joint Motion to Amend the Discovery Schedule (Docket #54) be ALLOWED. In light of the nature of the materials ordered produced, the court finds it prudent to suggest that the parties enter a protective order at least as to the materials at issue in the instant motion.

/S/ David H. Hennessy
David H. Hennessy
UNITED STATES MAGISTRATE JUDGE