## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ———————————————— ) | |
| **DEEPA SONI, M.D.,** ) | |
| ) | **CIVIL ACTION** |
| **Plaintiff,** ) | |
| ) | **NO. 16-10630-TSH** |
| **v.** ) | |
| ) | |
| **ROBERT WESPISER, M.D., TIMOTHY** ) | |
| **COUNIHAN, M.D., BERKSHIRE** ) | |
| **MEDICAL CENTER, BERKSHIRE** ) | |
| **FACULTY SERVICES, INC. and** ) | |
| **BERKSHIRE HEALTH SYSTEMS, INC.** ) | |
| ) | |
| **Defendants.** ) | |
| ———————————————— ) | |

## ORDER AND MEMORANDUM ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Docket No. 105)

### August 19, 2019

Plaintiff Deepa Soni, M.D., a board-certified, female neurosurgeon of Indian descent, filed a complaint alleging defendants Robert Wespiser, M.D., Timothy Counihan, M.D., Berkshire Medical Center, Inc. ("BMC"), Berkshire Faculty Services, Inc. ("BFS"), and Berkshire Health Systems, Inc. ("BHS") discriminated against her on the basis of her gender and ethnicity, retaliated against her, made defamatory statements about her which negatively impacted her career, tortuously interfered with advantageous business relationships, and interfered with her rights in violation of Massachusetts law.

Defendants now move for summary judgment on all of Plaintiff's remaining claims. For the reasons state below, Defendants' motion is ***granted*** in part and ***denied*** in part.

### Background

This Court's review of the record is in the light most favorable to the party opposing summary judgment. *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 50 (1st Cir. 2000).

On November 1, 2008, Plaintiff began working for BFS at the Berkshire Medical Center. Pursuant to Plaintiff's contract, both BFS and BMC were her join-employers.  During all relevant periods, Defendant Counihan was the Chairman of the Department of Surgery.  In addition, Defendant Wespiser served as Chief of staff of the independent medical staff at BMC.  Both supervised Plaintiff.

While interviewing for the position with BFS, Plaintiff disclosed to Defendants Counihan and Wespiser and to another one of her prospective supervisors, Lisa Trumble, Vice President of Physician Services for BHS and Executive Director of BFS, that she had discrimination lawsuits pending against Brigham & Women's Hospital and Boston Medical Center.

On January 23, 2009, Plaintiff filed a written complaint documenting concerns with the hospital administration.  Specifically, Plaintiff alleged that Dr. Leon Gilner—another of Plaintiff's supervisors—treated her and other women in a sexist, derogatory, and threatening manner.  Shortly after on January 26, a "professional coaching session" was held with Plaintiff, Dr. Gilner, General Counsel John Rogers, Diane Kelly, and Lisa Trumble.  Plaintiff was provided feedback from that meeting that she was "a bit timid and Prima Donnish; meek and agreeable; passive/aggressive and somewhat defensive; and too sensitive." (Docket No. 111 ¶ 128).  In addition, a note from the meeting indicated that Plaintiff was "hired with some baggage, personally and professionally." *Id.* According to Plaintiff, Defendant Counihan was dismissive of her complaints.

In April 2009, Dr. Gilner was fired.  According to John Rogers, Plaintiff's complaints were not a significant factor in the decision to terminate Dr. Gilsner's employment.  Plaintiff disagrees

with this assessment.   Plaintiff then became the lone fulltime neurosurgeon at BMC. Consequently, Defendants were concerned that BMC might lose its status as a Level II Trauma Center.[1]  According to Plaintiff, her workload became overwhelming after Dr. Gilner's departure. Further, Plaintiff's relationship with Defendant Counihan deteriorated and, according to Plaintiff, he began to micro-manage her practice.

On September 23, 2009, Plaintiff tendered her resignation and her last day of employment with BFS was May 9, 2010.  In April 2013, Plaintiff was offered a "locums to perm" position at a clinic in New Hampshire, which she accepted.  The position required her to obtain credentials at three local hospitals.  Plaintiff obtained credentials from two local hospitals, however, the third—Catholic Memorial Hospital ("Catholic")—advised her that she would be denied privileges of she pursued them and should withdraw her request.  Catholic was the only hospital to contact Defendant Counihan in evaluating Plaintiff's credentialing.

Catholic asked Defendant Counihan to score Plaintiff on six "core competencies."  In four categories—Medical/Clinical Knowledge, Patient Care, Practice Based Learning and Improvement, and Systems-Based Practice—Defendant Counihan rated Plaintiff as "good." However, in two different categories—Interpersonal Communication Skills and Professionalism—Defendant Counihan rated Plaintiff as "poor."

In the narrative supplement, Defendant Counihan indicated that Plaintiff "failed to regulate her work and clinical care . . . to the point of being disruptive to many aspects of the hospital's healthcare delivery system;" did not "reliably start her workday at an hour . . . consistent with appropriate care of patients;" was "habitually late for her clinic despite our adjusting the scheduled start time;" was "not punctual to the operating room;" "failed to adequately estimate how long her

---

[1] Level II Trauma Centers require 24/7 neurosurgery availability.

surgery would take, leading to her patient's [sic] being under anesthesia for unexpectedly long periods and significant disruptions in our operating room schedules;" provided unreliable determinations "of when surgery should be considered emergent" leading "to extreme disruption of our operating room and the need for the chairman of anesthesia and me to review all of her cases to ensure those she called 'emergent' were really emergencies;" and "could not be counted upon to communicate effectively or act as a good team player." (Docket No. 111 ¶ 79).

In addition, Defendant Counihan informed Catholic that BMF chose not to renew Plaintiff's contract when Plaintiff had, in fact resigned.[2]  Moreover, during a follow-up telephone call, he told Dr. Patrick Mahon of Catholic Medical Center that Plaintiff "had personality quirks which caused her to be fired from Boston Medical Center." *Id.* ¶ 155.  Defendant Counihan also told Dr. Mahon that "following her employment at Berkshire Medical Center, [Plaintiff] was hired by Mt. Auburn, but showed up 9 months pregnant, immediately went on maternity leave, and never worked there." *Id.*  According to Plaintiff, this was also a lie.  Following that call, the Credentials Committee at Catholic voted to deny Plaintiff's application for privileges.

From November 2013 through June 2015, Plaintiff worked on a "locum tenens" basis at the Baystate Medical Center in Springfield, Massachusetts.  When a fulltime neurosurgeon position opened, she applied.  Defendant Counihan spoke to at least two physicians at Baystate regarding Plaintiff's candidacy for the position.[3]  Plaintiff was never offered the fulltime position at Baystate.

---

[2] Defendants point out that Defendant Counihan indicated in another part of the evaluation that "when Dr. Soni tendered her notice that she wished to terminate her contract, that offer was accepted." (Docket No. 111 ¶ 80)

[3] Defendants object that the alleged Baystate communications are hearsay and that the Court may therefore not consider them. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").  Defendant Counihan's actual out-of-court statements pose no admissibility problem.  They are admissible nonhearsay either as

## Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that the court shall grant summary judgment if the moving party shows, based on the materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A factual dispute precludes summary judgment if it is both "genuine" and "material." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505 (1986). An issue is "genuine" when the evidence is such that a reasonable factfinder could resolve the point in favor of the nonmoving party. *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994). A fact is "material" when it might affect the outcome of the suit under the applicable law. *Id*.

The moving party is responsible for "identifying those portions [of the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986). It can meet its burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the nonmoving party's case.'" *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005), *aff'd*, 442 F.3d 7 (1st Cir. 2006) (quoting *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548). Once the moving party shows the absence of any disputed material fact, the burden shifts to the non-moving party to place at least one material fact into dispute. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st

---

admissions of a party opponent, *see* Fed. R. Evid. 801(d)(2)(A), or because they are not offered for the truth of the matter asserted—in fact, they are offered for just the opposite.

The repetition of Defendant Counihan's statement by another, however, poses a more difficult problem. According to Plaintiff, Dr. Sherry Taylor from Baystate told her about Defendant Counihan's statements. Thus, Dr. Taylor necessarily made the implicit statement, "Defendant Counihan said this!" *See Larez v. City of Los Angeles*, 946 F.2d 630, 642 (9th Cir. 1991). Accordingly, Dr. Taylor's statement to Plaintiff is an out-of-court statement offered for the truth of the matter asserted and therefore "cannot be taken into account for purposes of the summary judgment calculus." *Landrau-Romero v. Banco Popular de Puerto Rico*, 212 F.3d 607, 614 n.8 (1st Cir. 2000).

Cir. 1994) (citing *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548). When ruling on a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002) (citation omitted).

## Discussion

As a preliminary matter, Defendants allege that they cannot be liable for Defendant Counihan's communications because Plaintiff signed the following release:

> To the fullest extent permitted by law, I extend absolute immunity to, and release from, any and all liability, the hospital and any third party . . . for any acts, communications, reports, records, statements, documents, recommendations or disclosures involving me . . . made or given *in good faith* . . . .

(Docket No. 111 ¶ 51) (emphasis added). Defendants, however, cannot discriminate and retaliate freely because Plaintiff signed the release. Plaintiff alleges that Defendant Counihan lied about her and that those lies were motivated by animus. That sort of conduct is inherently not in good faith. Accordingly, if Plaintiff presents enough evidence that a reasonable jury might find for her, that she signed the release is of no moment.

### 1. *Discrimination Claims*

Both Title VII and Chapter 151B contain provisions prohibiting employers from discriminating against employees based on gender.[4] Gender discrimination can come in two

---

[4] In its Memorandum and Order on Defendants' motion to dismiss, this Court acknowledged that "no Massachusetts appellate decision has ever interpreted § 4(1) to apply to an action brought by or against someone outside of the employment unit." *Soni v. Wespiser*, 239 F. Supp. 3d 373, 384 (D. Mass. 2017) (quoting *Thomas O'Connor Constructors, Inc. v. MCAD*, 893 N.E.2d 80, 85-86 (Mass. App. Ct. 2008))). Nonetheless, the Court noted that Mass. Gen. Laws ch. 151B § 4(4A) makes it unlawful "[f]or any person to coerce, intimidate, threaten, or interfere with another person in the exercises or enjoyment of any right granted or protect by this chapter." While Massachusetts courts have not yet defined the precise scope of Section 4(4A), *Araujo v. UGL Unicco-Unicco Perations*, 53 F. Supp. 3d 371, 383 n.8 (D. Mass. 2014), presumably it would also apply outside of the employment unit. *See McLaughlin v. City of Lowell*, 992 N.E.2d 1036, 1058 n.34 (Mass. App. Ct. 2013) ("As such, § 4(4A) is best understood as a device through which an individual falling outside the scope of the definition of 'employer' may otherwise by liable for

forms. *Burns v. Johnson*, 18 F. Supp. 3d 67, 72 (D. Mass. 2014).  First, "[i]t can mean that the defendant took a discrete, adverse employment action against the plaintiff because of his or her gender." *Id.* (citing *Johnson v. Univ. of P.R.*, 714 F.3d 48, 53 (1st Cir. 2013)).  Second, it "can also mean that the defendant harassed the plaintiff based on . . . her gender and thereby created a gender-based hostile work environment." *Id.* (citing *Johnston*, 714 F.3d at 53).  Plaintiff asserts the first type of Title VII claim—that Defendants took adverse employment action against her because of her gender.[5]

Because Plaintiff failed to proffer any direct evidence of discrimination, her claim is generally governed by the burden shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Garcia v. Bristol-Myers Squibb Co.*, 535 F.3d 23, 31 n.2 (1st Cir. 2008).[6, 7]  "The elements of the prima facie case vary according

---

conduct which the antidiscrimination statue aims to prevent."); *see also Thomas O'Connor Constructors, Inc. v. MCAD*, 893 N.E.2d 80, 86 n.10 (Mass. App. Ct. 2008) (noting that "interpreted literally, the scope of § 4(4A) is almost without limit").

    Defendants only argument supporting their motion for summary judgment specifically related to Plaintiff's rights interference claim is that Plaintiff has not demonstrated actionable discriminatory conduct. *See McLaughlin*, 84 Mass. App. Ct. at 74 ("Absent actionable discriminatory conduct, there exists no basis on which to ground a claim of interference").  But the *McLaughlin* court explicitly noted that discrimination outside of the employment context seems to be precisely the kind of discrimination Section 4(4A) is meant to address.  Accordingly, if Defendant Counihan discriminated against Plaintiff, it would be actionable. *See Soni*, 239 F. Supp. 3d at 384 (finding that Plaintiff's "Chapter 151B discrimination claims find legs in the language of § 4(4A)").

[5] In ruling on Defendants' motion to dismiss, this Court concluded that the "a negative reference to a prospective employer may constitute an adverse employment action." *Soni*, 239 F. Supp. 3d at 384.

[6] The Court will apply the same framework to assess Plaintiff's claims under state and federal law. *See Xiaoyan Tang*, 821 F.3d at 215 n.9; *see also Knight v. Avon Products, Inc.*, 438 Mass. 413, 420, 780 N.E.2d 1255 (2003) (noting the Supreme Judicial Court's adoption of the *McDonnell Douglass* framework "as an aid to the resolution of claims of employment discrimination under G.L. c. 151B" (citation omitted)).

[7] A Plaintiff may also demonstrate sex discrimination "by presenting evidence of discrimination on the basis of a prohibited bias under the mixed-motives theory of discrimination." *Burns v. Johnson*, 829 F.3d 1, 8 (1st Cir. 2016); *see also Quigg v. Thomas County School Dist.*, 814 F.3d 1227, 1235 n.4 (11th Cir. 2016) ("Mixed-motive and single-motive discrimination are different theories of discrimination, as opposed to distinct causes of action.  Specifically, they serve as alternative causation standards for proving discrimination.").  Because Plaintiff has not pursued a mixed-motive theory, however, the Court will assess her claims under the *McDonnell* framework. *See Sher v. U.S. Dept. of Veterans Affairs*, 488 F.3d 489, 508 n.22 (1st Cir. 2007) (granting defendant summary judgment where plaintiff did "not pursue[ ] a mixed

the nature of the plaintiff's claim, but the plaintiff must show, among other things, that she suffered an adverse employment action." *Lockridge v. The University of Maine System*, 597 F.3d 464, 470 (1st Cir. 2010); *see also River-Rivera v. Medina & Medina, Inc.*, 898 F.3 77, 88 (1st Cir. 2018) ("Establishing a prima facie case isn't usually a tough sell."). If the plaintiff can establish a prima facie case, "the burden of production—but not the burden of persuasion—shifts to the employer, who must articulate a legitimate, non-discriminatory reason for the adverse employment action." *Id.* If the employer proffers a legitimate reason for the adverse action, "the focus shifts back to the plaintiff, who must then show, by a preponderance of the evidence, that the employer's articulated reason for the adverse employment action is pretextual and that the true reason for the adverse action is discriminatory." *Id.*

I will assume Plaintiff has met her modest burden of establishing a prima facie case. *See Garcia*, 535 F.3d at 30-31; *Lockridge*, 597 F.3d at 470; *see also Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 535 (1st Cir. 1996) ("On summary judgment, the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead of whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus."). Defendants have also proffered a legitimate, non-discriminatory reason for the adverse action: their portrayal of Plaintiff was truthful. Accordingly, the Court must determine whether Plaintiff has identified evidence that would permit reasonable jurists to conclude that Defendants' proffered reason is pretextual.

I find that a reasonable jury could find the proffered reasons pretextual. First, the record demonstrates that reasonable jurors could find some of the things Defendant Counihan said about Plaintiff were false, which would belie Defendants proffered legitimate reason for the adverse

---

motive theory" because the "failure to assert a mixed motive claim before the district court amount[ed] to a waiver of the claim").

action.  For instance, in the questionnaire he submitted to Catholic, Defendant Counihan indicated that BMC chose not to renew Plaintiff's contract. (Docket No. 111 ¶ 155).[8]  Further, Dr. Counihan told Dr. Mahon that Plaintiff was fired from Boston Medical Center. *Id.* ¶ 157.  Both statements are untrue.  In addition, Defendant Counihan told Dr. Mahon that "following her employment at Berkshire Medical Center, Dr. Soni was hired by Mt. Auburn, but showed up 9 months pregnant, immediately went on maternity leave, and never worked there." *Id.* (brackets omitted).  Not only is that statement false, it not so subtly implied that Plaintiff was an inferior doctor based on stereotypes about working women. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) ("[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group . . . .").[9]

Accordingly, I find that a genuine dispute of material fact exists as to whether Defendants' proffered reasons were pretextual.  Accordingly, Plaintiff's discrimination claims survive this motion.

### 2. Retaliation Claims

---

[8] As noted above, Defendants argue that this was obviously a mistake as evidenced by the fact that Defendant Counihan later corrected himself in his written narrative.  While this is a reasonable interpretation, the fact that Defendant Counihan lied several times about Plaintiff presents a question of material fact for the jury: what his motivations were for those lies.

[9] Plaintiff also argues that there are other statements that traffic in stereotypes.  For example, on January 26, 2009, a meeting was held with Plaintiff, Dr. Gilder, John Rogers, Diane Kelly, and Lisa Trumble.  The meeting was supposed to be a "professional coaching session" to help resolve the conflict between Plaintiff and Dr. Gilner.  Dr. Soni was provided feedback from co-workers that she was "a bit timid and 'Prima Donnish,'" "meek and agreeable," "passive/aggressive and somewhat defense," and "too sensitive." (Docket No. 111 ¶ 128).  A note from that meeting also indicated that Plaintiff was "hired with some baggage, personally and professionally." *Id.*  It is unclear who provided Plaintiff this feedback.

Defendant Counihan took the adverse, allegedly discriminatory action; thus, the relevance of the statements by other, unidentified employees is unclear.  If this were a hostile work environment claim, where the employer negligently permitted the environment to become pervaded with discrimination, these statements may be relevant.  That is not the case here.  Accordingly, the Court will not consider the statements.

Both Title VII and Chapter 151B also contain provisions that prohibit employers from retaliating against persons who complain about unlawful discriminatory employment practices. *See* 42 U.S.C. § 2000e-3(a); Mass. Gen. Laws ch. 151B, § 4(4).  Retaliation claims based on circumstantial evidence are evaluated using the same *McDonnell* burden-shifting framework noted above. *Ponte v. Steelcase Inc.*, 741 F.3d 310, 321 (1st Cir. 2014).[10]  To make a prima facie case, a plaintiff "must show that she engaged in protected conduct, that she suffered an adverse employment action, and that a causal nexus exists between the protected activity and the adverse action." *Ponte*, 741 F.3d at 321.  "The causation element of a Title VII retaliation claim is not satisfied by evidence that retaliation was one motivating factor in the adverse action." *Roy v. Correct Care Solutions, LLC*, 914 F.3d 52, 70 (1st Cir. 2019).  Instead, a plaintiff "must show 'but-for' causation." *Id.*  In other words, a plaintiff must show that the adverse action would not have occurred in the absence of the protected activity. *Id.*

Like the analysis above, I will proceed directly to the nexus element.[11]  Defendants argue that it is implausible that Defendant Counihan retaliated against Plaintiff because of the absence of a temporal nexus between the protected conduct and the adverse action.

Temporal proximity can create an inference of causation. *See Planadeball v. Syndham Vacation Resorts, Inc.*, 793 F.3d 169, 177 (1st Cir. 2015); *see also Noviello v. City of Boston*, 398 F.3d 76, 86 (1st Cir. 2005) (noting where adverse employment action "follows hard on the heels of protected activity, the timing often is strongly suggestive of retaliation").  Further, "the inference of a causal connection becomes tenuous with the passage of time." *Dressler v. Daniel*, 315 F.3d

---

[10] As noted above, Massachusetts courts have adopted the *McDonnell Douglass* framework for evaluating these claims.

[11] Defendants concede that Plaintiff's formal complaint was a protected activities. *See* Docket No. 106, at 16.  In addition, the adverse action, like her discrimination claim, is that Dr. Counihan lied about her to other hospitals following her employment at BMC.

75, 80 (1st Cir. 2003); *see also Lewis v. Gillette Co.*, 22 F.3d 22, 25 (1st Cir. 1994) (granting summary judgment where more than two years elapsed between the protected conduct and the alleged retaliation); *Mesnick v. General Elec. Co.*, 950 F.2d 816, 828 (1st Cir. 1991) (holding that the nine month period between the protected conduct and alleged retaliation undermined the inference of causation); *Calero-Cerezo v. U.S. Dept. of Justice*, 355 F.3d 6, 25 (1st Cir. 2004) (noting that "three and four month periods have been held insufficient to establish a causal connection based on temporal proximity").

The First Circuit has made clear, however, temporal proximity "is merely one factor relevant to causation." *Garayalde-Rijos v. Municipality of Carolina*, 747 F.3d 15, 25 (1st Cir. 2014); *see also Trainor v. HEI Hospitality, LLC*, 699 F.3d 19, 28 (1st Cir. 2012) (treating "temporal proximity" between protected activity and adverse action as just one factor, "reinforced by other evidence," which supported jury verdict); *Doherty v. Donahoe*, 985 F. Supp. 2d 190, 206 (D. Mass. 2013) (granting summary judgment because "[t]emporal proximity is absent *and no other facts raise an inference or sufficiently support such a causal connection*" (emphasis added)); *Robinson v. Southeastern Pa. Transp. Auth.*, 982 F.2d 892, 894 (3d Cir. 1993) ("[M]ere passage of time is not legally conclusive proof against retaliation.").

Accordingly, the question here is whether, despite the almost five-year gap between the protected activity and the adverse employment action, Plaintiff has produced enough evidence to establish a causal connection.

Plaintiff attempts to explain the absence of temporal proximity by alleging "the Catholic request for information was the first opportunity Defendant Counihan had to retaliate against Dr. Soni after her departure from the Berkshire." (Docket No. 110, at 14).  However, Plaintiff's protected activity occurred at the end of January 2009.  She did not tender her resignation until

11

September 23, 2009.  Her resignation did not become effective until May 9, 2010.  Therefore, Defendant Counihan had plenty of time to retaliate. *See Mesnick*, 950 F.2d at 828.

However, a plaintiff can still succeed on a retaliation claim despite a lack of proximity if the record supports "a pattern of antagonism in the intervening period." *Jensen v. Potter*, 435 F.3d 444, 450 (3d Cir. 2006), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (noting that a pattern of antagonism in the intervening period can support a retaliation claim in the absence of temporal proximity).  Defendant Counihan admits that his and Plaintiff's relationship began to deteriorate after Dr. Gilner's termination. *See* Docket No. 111-41, at 5.  According to Plaintiff, Defendant Counihan began to micro-manage her practice and dismiss her concerns during this period, which lead to her resignation.  This is not enough, however, to demonstrate the animus required. *Cf. Jensen*, 435 F.3d at 450 ("The primate antagonist in Jensen's retaliation claim is letter carrier Joe Sickler.  Shortly after Waters's transfer to the Ashley office, Sickler called Jensen 'the [obscenity] who got [Waters] in trouble;' he also stated that when a new supervisor came Jensen would have to get off her 'fat [obscenity].'  Because these insults *directly relate* to Jensen's complaint against Waters, they raise an obvious inference of retaliatory animus." (emphasis added)).  Although Defendant Counihan and Plaintiff's relationship deteriorated after Dr. Gilner was fired, it is unclear what caused this deterioration.  Further, the record is absent of any actions or words which directly relate to Plaintiff's complaint against Dr. Gilner and would raise the inference of animus or support a causal connection. *See Doherty*, 985 F. Supp. 2d at 206.

Accordingly, Plaintiff's retaliation claims must fail.

*3.   Defamation*

In order to state a claim for defamation, a plaintiff must demonstrate: (1) the defendant published a false statement regarding the plaintiff—that is, the defendant communicated the statement concerning the plaintiff to a third party; (2) the statement could damage the plaintiff's reputation in the community; and (3) the statement caused economic loss or is otherwise actionable without proof of economic loss. *Flagg v. AliMed, Inc.*, 992 N.E.2d 354, 365 (Mass. 2013).

As noted above, Defendant Counihan told Catholic that BMC chose not to renew Plaintiff's contract. (Docket No. 111 ¶ 155).[12]  Further, Dr. Counihan told Dr. Mahon that Plaintiff was fired from BMC. *Id.* ¶ 157.   Finally, Defendant Counihan told Dr. Mahon that "following her employment at Berkshire Medical Center, Dr. Soni was hired by Mt. Auburn, but showed up 9 months pregnant, immediately went on maternity leave, and never worked there." *Id.* (brackets omitted).

Defendants contend that Plaintiff has not advanced any competent evidence that any of the material facts in the Catholic communications were untrue.   However, Plaintiff testified that all these statements were false and Defendant Counihan has himself admitted that some of his statements were false. *See* Counihan Aff. 115:18-22.

Defendants next argue that "[t]he Catholic Communications, although critical of [Plaintiff's] conduct in some respects, were not wholly negative or tending to hold [Plaintiff] up to scorn, hatred, ridicule or contempt." (Docket No. 106, at 17).   Defendants, however, does nothing to further develop this argument.   As it is not this Court's job to put flesh on Defendants' bare bones argument, it is waived. *See Medina-Rivera v. MVM, Inc.*, 713 F.3d 132, 140 (1st Cir. 2013) ("'[D]eveloping a sustained argument out of . . . legal precedents' is appellant's job, not

---

[12] Defendant Counihan admitted at his deposition that this statement was false. *See* Counihan Aff. 115:18-22.

ours." (quoting *Town of Norwood v. Fed. Energy Regulatory Comm'n*, 202 F.3d 392, 405 (1st Cir. 2000))).

Third, Defendant contends that even if the Catholic communications were defamatory, they are conditionally privileged. "[A] publisher is conditionally privileged to publish defamatory material if he or she is a supervisor, executive, or a corporate officer and the information is reasonably related to the employer's legitimate business interest, or if the publisher and the recipient share a common interest and the communication is of a kind reasonably calculated to protect or further it." *Sklar v. Beth Israel Deaconess Med. Ctr.*, 797 N.E.2d 381, 388 (Mass. App. Ct. 2003) (quotation marks and citation omitted). Defendants, however, do nothing to explain how the facts of this case establish the privilege. "For a claim of defamation, a conditional privilege is an affirmative defense; the burden rests on the defendant to prove that his defamatory statements were otherwise privileged." *Harrington v. Costello*, 7 N.E.3d 449, 457 n.17 (Mass. 2014). Defendants have not provided the Court with any facts from which it can conclude the privilege exists between the hospitals. *Cf. Humphrey v. National Semiconductor Corp.*, 463 N.E.2d 1197, 1198 (Mass. App. Ct. 1984) ("The burden is upon the defendants to show *facts* which create the qualified privilege. *They have done so by affidavits, by the master's reports, and by depositions of Green and of the plaintiff Humphrey* . . . and were not contravened by any material offered by the plaintiff."). Accordingly, Defendants have not satisfied their burden to demonstrate privilege, and the Court will not assume it exists.

### 4. Tortious Interference

To succeed on a claim of tortious interference with an advantageous relationship under Massachusetts law a plaintiff must show:

> (1) That she had a business relationship, (2) that the defendant knew of this
> relationship, (3) that the defendant intentionally and maliciously interference with
> the relationship, and (4) that the defendant's actions harmed her.

*Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 76 (1st Cir. 2001) (citing *Comey v. Hill*, 387 Mass. 11, 19 (1982)); *see also American Private Line Servs., Inc. v. Eastern Microwave, Inc.*, 980 F.2d 33, 36 (1st Cir. 1992) (noting that a plaintiff "need not prove that it had a binding contract. A probable future business relationship anticipating a reasonable expectancy of financial benefit will suffice" (citing *Powers v. Leno*, 509 N.E.2d 46, 49 (Mass. App. Ct. 1987))).

Because a tortious interference claim is typically not permitted against a party to a contract, employees are normally precluded from bringing claims against their employers for tortuous interference. *Welch v. Ciampa*, 542 F.3d 927, 944 (1st Cir. 2008). However, "a supervisor can be labile for tortious interference if "actual malice . . . was the controlling factor in the supervisor's interference.'" *Id.* (quotation marks and brackets omitted) (quoting *Sklar*, 797 N.E.2d at 385).

Defendants argue that Plaintiff has failed to demonstrate actual malice and consequently her claim must fail. First, the Court is skeptical that Plaintiff needs to demonstrate actual malice in this case because the relevant relationship was not the contractual relationship in which Defendant Counihan supervised Plaintiff. And even if Plaintiff had to demonstrate malice, the First Circuit has reasoned that "[c]ertain situations lend themselves to proof of malice. Pertinently, the SJC has held that the elements underlying a claim for unlawful discrimination may be used to demonstrate malice in the context of a tortious interference claim." *Zimmerman v. Direct Federal Credit Union*, 262 F.3d 70, 77 (1st Cir. 2001). Thus, if Plaintiff were required to demonstrate malice, because her discrimination claims survive this motion, she has proffered enough evidence of malice at this stage.

## Conclusion

15

For the reasons stated above, Defendants' motion (Docket No. 105) is ***granted*** in part and ***denied*** in part.  Accordingly, Plaintiff's discrimination, defamation, and tortious interference claims survive this motion.  In addition, Defendants are granted summary judgment on Plaintiff's retaliation claims.

**SO ORDERED**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**